UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DEBRA A. WANZO,

                                        Plaintiff,

        v.                                                      3:05-CV-1521
                                                                (GLS/GJD)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

JONATHAN P. FOSTER, ESQ., for Plaintiff
WILLIAM H. PEASE, Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

### REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation by the Honorable

Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

### PROCEDURAL HISTORY

        Plaintiff filed an application for disability insurance benefits on December 12,

2003, alleging disability beginning October 22, 2003.  (Administrative Transcript

("T."), 38-40).  The application was denied initially and on reconsideration.  (T. 31,

37A-37D).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"),

and a hearing was held on March 8, 2005.  (T. 37E, 288-311).  At the hearing,

testimony was taken from the plaintiff (T. 292-307), and from a vocational expert (T.

307-10).

        In a decision dated July 25, 2005, the ALJ found that plaintiff was not disabled.

(T. 19-28).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on October 6, 2005.  (T. 4-6).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The ALJ violated the treating physician rule.  (Plaintiff's Brief, 9-11).

(2) The ALJ's credibility determination is not supported by the record. (Plaintiff's Brief, 11-13).

(3) The ALJ failed to ask the Vocational Expert ("VE") hypothetical questions containing the appropriate limitations in plaintiff's residual functional capacity. (Plaintiff's Brief, 13-14).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record, and must be affirmed.

## FACTS

**A.** **Non-Medical Evidence and Testimony**

Plaintiff, who was 42 years old at the time the ALJ rendered his decision, has a high school education.  (T. 292).  Plaintiff stated that she previously worked as a typist, waitress, janitor, and stitcher.  (T. 55, 72, 292, 302-03, 306-07).

Plaintiff testified that she experienced neck and shoulder pain during September of 2002, a year after she had surgery on her neck.  (T. 299-300, 303).  She stopped working during September of 2003.  After returning to her surgeon, plaintiff was prescribed physical therapy.  According to plaintiff, the physical therapy did not provide any relief.  Plaintiff also used a TENS unit.  (T. 300).  Plaintiff testified that

2

she suffered from depression, problems sleeping, and a loss of appetite.  (T. 301).  She stated that her depression began after the birth of her now seven year old child.  (T. 302).  Plaintiff also noted that she had a problem with alcohol but that she "voluntarily took care of the problem."  (T. 304-05).

Plaintiff testified that on a typical day, she watched television and tried to load and unload the dishwasher over a period of time.  (T. 297-98).  In regards to household chores, plaintiff stated that she does the dishes, laundry, and vacuuming, although breaks are necessary and she gets help from her daughter.  She rarely goes grocery shopping.  (T. 294-97).  She also testified that she only drives in emergency situations or when she has no other choice because driving irritates her neck and shoulders.  (T. 295).  Plaintiff stated that she visits friends occasionally when her husband is home but that she never attends church or social activities nor goes out to eat or to the movies.  (T. 299).  When asked about her physical capabilities, plaintiff responded that she is not able to stand or walk for any prolonged length of time due to the pain in her foot from its partial amputation.[1]  (T. 298).

## B.   Vocational Expert Testimony

At the hearing, the ALJ asked the vocational expert to describe plaintiff's past relevant work in terms of exertional and skill level.  (T. 305-08).  The vocational expert was asked some hypothetical questions by the ALJ.  (T. 308-09).  The first hypothetical posed related to a person who could lift no more than twenty pounds occasionally and ten pounds frequently with the right dominant hand only and five

---

[1] At the age of nine, plaintiff was involved in an accident with a lawnmower.  (*See* T. 182).  As a result, the partial amputation occurred.  (*Id.*)

pounds maximum with the left hand.  (T. 308).  Furthermore, the individual could sit for up to six hours, stand for no more than two hours, alternate positions between standing and sitting every ten minutes, and perform activities involving no overhead reaching.  (*Id.*)  Additionally, the person would be able to remember, understand, and carry out no more than simple instructions and make simple work related decisions.  (*Id.*)  The vocational expert testified in response to the hypothetical that plaintiff would be able to perform work as a preparer for jewelry processing or lens inserter, and that there were a sufficient number of these jobs available.  (T. 308-09).  The vocational expert then responded to the ALJ that if plaintiff needed six or seven unscheduled breaks during the workday, she would not be able to sustain an 8-hour workday.  (T. 309).

**C.**   **Medical Evidence**

  **1.**  **Dr. Mark J. Corey - Department of Family Practice, Robert Packer Hospital**

On August 25, 2002, plaintiff was admitted to the Robert Packer Hospital complaining of severe bilateral lower extremity pain.  (T. 91-107).  Upon her discharge on August 26, 2002, Dr. Mark J. Corey stated that the pain in plaintiff's right calf was resolved but she still had severe pain in the left calf.  (T. 91).  He noted that an x-ray of the left lower leg showed no bony defect.  (*Id.*)  Physical therapy was performed and she was given crutches.  (T. 91-92, 104-05).  Dr. Corey prescribed Neurontin, Tylenol, Celexa, and Vioxx and told her not to engage in weight-bearing activities until the symptoms improved.  (T. 92).

4

### 2.  **Dr. Thomas A. Yaeger - Department of Family Practice, Guthrie Clinic Ltd.**

On October 6, 2002, Dr. Yaeger told plaintiff that a Magnetic Resonance Imaging ("MRI") of her neck showed severe narrowing of the left neural canal at C6-7.  (T. 117, 129).  He prescribed Vicodin and referred her to Dr. Anton for a neurological consultation.  (T. 117).  On October 31, 2002, plaintiff presented with chest pain.  (T. 111-12).  Dr. Yaeger noted that plaintiff smoked one and one-half packs a day and drank four or more alcoholic beverages per day.  (T. 111).  He found that a chest x-ray looked normal with some hyperinflation.  (T. 111, 127).

On April 28, 2003, plaintiff complained of pain and stress at work and home.  (T. 223-24).  Dr. Yaeger opined that she was in no distress, her neck was normal, that she should decrease her alcohol consumption, although she did not want to go to Alcoholics Anonymous.  (*Id.*)

Subsequently, on October 20, 2003, Dr. Yaeger found that range of motion in plaintiff's neck was decreased, strength in the upper extremities showed mild weakness of the left triceps, and other normal reflexes were intact.  (T. 219-20).  He stated that there was possible recurrence of her cervical disc disease and ordered an MRI.  (T. 219).  Naprosyn and Percocet were prescribed.  (T. 219-20).  On October 23, 2003, another MRI of the cervical spine showed that the cervical vertebral segments were well aligned and there were no definite signal abnormalities of the underlying spinal cord.  (T. 119).  On October 27, 2003, an MRI of the cervical spine revealed slight forward displacement of the C4 on C5.  (T. 118).  On December 3,

2003, Dr. Yaeger found that plaintiff's range of motion in her neck and left shoulder was decreased.  (T. 217-18).  Dr. Yaeger told her to take her medications, including Celexa, Naporxyn, and Vicodin, recommended therapy prescribed by neurosurgery, and stated she was disabled until February 2004.  (T. 218).

On January 28, 2004, Dr. Yaeger stated that plaintiff's range of motion in her neck and left shoulder was limited, strength in the upper extremities was diffusely a little weak in the left arm, and there was marked paraspinous muscle spasm.  (T. 216). He told plaintiff to continue physical therapy and stated that she was disabled until May 2004.  (*Id.*)  He also prescribed Vicodin.  (*Id.*)  On March 11, 2004, plaintiff complained of neck and shoulder pain.  (T. 214-15).  Dr. Yaeger reported that plaintiff had been lifting and pulling objects to clean her house.  His office note also makes reference to the fact that plaintiff hired an attorney to "maintain her job with the county."  (T. 214).  Dr. Yaeger also stated

> Since we are trying to get her back to work, I think that's [sic] keeping her in physical therapy if they can help her would be beneficial.

(T. 214).

Upon examination, Dr. Yaeger found the range of motion of plaintiff's neck to be limited but that rotation looked normal apart from titling, there was only slight muscle spasm, strength testing was difficult, reflexes were 2+ and symmetrical, the left shoulder had normal range of motion, and palpation of the subacrominal bursa area caused pain.  (*Id.*)  Dr. Yaeger stated that claimed tenderness was perplexing because a cortisone shot did not help and x-rays were normal.  (T. 215).  He noted that her "disability" continued until May 2004 and he renewed a prescription for Vicodin.

6

(*Id.*)

Thereafter, on April 6, 2004, Dr. Yaeger noted that consultations from orthopedics and neurology for her physical ailments did not show a causative problem and that another doctor opined that plaintiff's problem could be psychosomatic. (T. 213). He stated that she should attend more physical therapy and exhaust that option before exploring other treatments. (*Id.*) On April 22, 2004, Dr. Yaeger noted that plaintiff still complained of neck and left shoulder pain and that physical therapy was not helping. (T. 212). He stated that the neck was without lymphadenopathy but that because of the pain, plaintiff should not work until August 2004. (*Id.*)

On August 4, 2004, Dr. Yaeger examined plaintiff for her neck pain. (T. 210-11). He stated that her neck was unremarkable although there was decreased range of motion on extension and left rotation, no paraspinous muscle spasms were present, strength in the upper extremities was 5+ and symmetrical, and reflexes were 2+ and symmetrical. (T. 211). Dr. Yaeger opined that because of the neck discomfort, plaintiff could not return to work until January 2005. (*Id.*) On September 20, 2004, plaintiff inquired of Dr. Yaeger about entering alcohol rehabilitation. (T. 209). On December 6, 2004, Dr. Yaeger noted that plaintiff was admitted to St. Joseph's Hospital for detox. (T. 208). On December 20, 2004, plaintiff stating she was having chest pain and Dr. Yaeger stated that it could possibly be gastroesophageal reflux but noted that she should stop drinking and smoking. (T. 207). He also noted at that time that her neck was normal. (*Id.*)

On January 17, 2005, plaintiff complained of back and arm pain. (T. 205). Dr.

7

Yaeger stated that there had been a complete investigation of the cause of the cervical pain and that she was not an operative candidate. (*Id.*) On January 25, 2005, Dr. Yaeger noted that plaintiff "grimace[d]" when she moved onto the examination table but that her neck was normal. (T. 202-03).

### 3. **Dr. Rein Anton - Neurosurgeon, Guthrie Clinic Ltd.**

On October 11, 2002, Dr. Rein Anton examined plaintiff for left shoulder pain. (T. 113-16). He found the neck was supple, cervical range of motion was full in all directions, range of motion was full in all four extremities, there was no joint swelling or tenderness, the shoulder shrug was strong and symmetrical, and sensation was intact. He found normal bulk and tone, strength was 5/5 throughout the upper and lower extremities bilaterally, left triceps reflex was very low but the rest were normal, the left shoulder was sore with movement, and gait was normal. (T. 114-15). An MRI taken of the cervical spine showed two big disc bulges, one at C5-C6 and the other at C6-C7. (T. 115). Additionally, the MRI showed narrowing of the foramen, especially on the left, and big bony spurs bilaterally. (*Id.*) Dr. Anton recommended a surgical option, anterior cervical diskectomy and fusion. (*Id.*)

On November 4, 2002, Dr. Anton performed an anterior cervical diskectomy and fusion at C5-C6 and C6-C7. (*See* T. 111). A post-surgical cervical spine x-ray taken on November 4, 2002 revealed fusion at the C5-C6 and C6-C7 levels and that alignment was satisfactory. (T. 126). On November 21, 2002, Dr. Anton conducted a post-operative examination and reported that plaintiff had no more arm pain, weakness, or numbness and that she was very satisfied but that she felt a bit stiff and

sore.  (T. 110).  He recommended starting physical therapy.  (*Id.*)  On December 31, 2002, Dr. Anton found no sensory nor motor deficit in the upper extremities and stated that x-rays of the cervical spine showed that the lower graft was fused.  (T. 108, 125, 225-26).  He recommended physical therapy, heat massage, mild stretching exercises, and strengthening exercises.  (*Id.*)

On January 30, 2003, an x-ray of plaintiff's lateral cervical spine showed fusion at the C5-6 and C6-7 levels and that bony alignment remained satisfactory.  (T. 121, 225).  Dr. Anton stated that he was releasing plaintiff back to ***full-time work*** starting in February 2003 with no limitations "except common sense[.]"  (T. 225). Subsequently, on January 21, 2005, Dr. Anton examined plaintiff for complaints of back, neck, shoulder, and arm pain.  (T. 204).  He found that all cranial nerves were normal, sensory was normal to pinprick and touch, strength was appropriate, and reflexes were brisk and all present.  (*Id.*)  Dr. Anton stated that plaintiff had no neurological findings and that he was recommending an MRI scan.  (*Id.*)

### 3.  <u>Robert Packer Hospital Outpatient Rehabilitation Services ("RPHORS")</u>

Plaintiff attended physical therapy at RPHORS from November 21, 2002 until January 22, 2003.  (T. 255-74).  After a visit on January 16, 2003, plaintiff reported being able to lift her child without pain, lift fifteen pounds overhead without discomfort, type on a computer without pain for a few hours, perform all activities without pain, and that she felt one hundred percent improvement.  (T. 256).  Plaintiff was discharged because her goals were met and she was compliant.  (*Id.*)

Plaintiff attended physical therapy again from December 29, 2003 through

February 11, 2004.  (T. 130-43, 255-74).  During that time, plaintiff missed several appointments and was ultimately discharged a short time after February 11, 2004 due to her failure to keep appointments and because she was non-compliant.  (T. 140).  However, while plaintiff attended her sessions, the physical therapists generally noted that there was slight to no improvement.  (T. 130, 132-33, 135-37, 141-43).

Plaintiff resumed physical therapy in March 2004 and continued until April 29, 2004, when she was discharged due to lack of progress and non-compliance.  (T. 230-40).  On May 3, 2004, physical therapist Laura Bozuhoski expressed to Dr. Yaeger in a letter that plaintiff demonstrated limited cervical and left upper extremity range of motion and decreased left upper extremity strength.  (T. 240).  She opined that plaintiff's subjective complaints were out of proportion to what was found objectively and that rehabilitation potential was poor secondary to continued lack of progress.  (*Id.*)  Plaintiff again attended physical therapy several times in February 2005 with no significant change.  (T. 284-87).

### 4.  St. Joseph's Hospital - Elmira, New York

On November 19, 2004, plaintiff voluntarily sought detoxification at St. Joseph's Hospital.  (T. 179-83).  Plaintiff admitted a problem with alcohol and reported that she was drinking twelve to twenty-four cans of beer on a daily basis.  (T. 179).  Dr. Sam Thompson conducted a brief physical examination and noted that her right foot had been partially amputated but there was no swelling or tenderness.  (*Id.*)  He found her to be in alcohol withdrawal and admitted her.  (T. 180).  Licensed Master Social Worker ("LMSW") William J. Irwin examined plaintiff during intake.

His report stated that plaintiff was oriented, her memory was mostly intact, there was no evidence of psychosis or current suicidal ideations.  Plaintiff's affect was flat, her thought processes were clear, and she was depressed.  (T. 182).  He diagnosed her with alcohol dependence with physiological dependence, cannabis use, and major depressive disorder, recurrent.  (T. 183).  He also assessed a Global Assessment of Functioning ("GAF")[2] score of 52, which indicates the existence of moderate mental health symptoms or moderate difficulties in social, occupational or school functioning.[3]  (*Id.*)

On November 23, 2004, plaintiff was again admitted to St. Joseph's Hospital for alcohol dependence with physiologic dependence and cannabis abuse.  (T. 175-78, 184-85).  Dr. Thompson noted that plaintiff's problem with alcohol began at the age of thirteen and marijuana use started at the age of sixteen.  (T. 175).  He also noted that plaintiff made several attempts at detoxification at the Robert Packer Hospital in 2003, October 2004, and three times in November 2004.  (*Id.*)  Dr. Thompson indicated that plaintiff had one suicide attempt years ago by overdosing on pills and that she had a history of physical and sexual abuse.  (T. 175-76).  Plaintiff's dependency counselor found that she suffered from withdrawal symptoms, she had no understanding of the disease concept of addiction and relapse, and she had no skill to intervene in her relapse.  (T. 176, 184).  She was discharged on December 3, 2004

---

[2] The Global Assessment of Functioning ("GAF") scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (American Psychiatric Association, 4th Ed. Text Revision 2000) ("DSM-IV-TR").

[3] *See* DSM-IV-TR 34.

with recommendations to follow-up with outpatient counseling.  (T. 176-77).

### 5. **Manar Hanna, M.D., State Agency Consultant**

On April 23, 2004, plaintiff was consultatively examined orthopedically by Dr. Manar Hanna.  (T. 144-47).  In a report, Dr. Hanna noted that plaintiff was able to cook, clean, do the laundry, shop, shower, bathe, and dress herself but with difficulty due to limited usage of the left arm.  (T. 145).  Upon physically examining plaintiff, Dr. Hanna found she was in no acute distress, she had a slight limp towards the right due to partial right foot amputation, she could walk on her heels and toes without difficulty, station was normal, and squat was full.  (*Id.*)  Dr. Hanna also reported that hand and finger dexterity were intact, grip strength was 5/5 bilaterally, cervical spine range of motion was limited without paracervical pain or spasm, there was full range of motion of the right shoulder but limited in the left, and there was no joint inflammation, effusion, instability, muscle atrophy, or sensory abnormality.  (T. 145-46).

Dr. Hanna's report further stated that there was full range of motion of the thoracic and lumbar spine, hips, knees, and ankles, apart from the area of amputation in the right foot, straight leg raising was negative bilaterally, and strength was 5/5 in the proximal and distal muscles bilaterally.  (T. 146).  Dr. Hanna concluded that plaintiff's prognosis was guarded and that she was restricted from activities requiring heavy lifting and carrying involving the left palm and right arm as well as prolonged extensive walking due to the partial amputation.  (T. 146-47).

### 6. **Carlton C. Aldrich, Ph.D., State Agency Consultant**

On May 14, 2004, plaintiff was consultatively examined by Carlton C. Aldrich, Ph. D., a psychologist.  (T. 288-93).  In a lengthy report, Dr. Aldrich commented on plaintiff's psychiatric history, current functioning, medical and family history, and performed a mental status examination.  (T. 149-54).  The report states that plaintiff denied any prior in-patient or out-patient mental health services.  (T. 149).  Dr. Aldrich noted that plaintiff complained of depression, trouble sleeping, and anxiety and indicated a history of alcohol abuse.  (T. 150).

Dr. Aldrich reported that plaintiff was cooperative during the interview and found that her thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia.  (T. 151).  He stated that plaintiff's mood was dysthymic, affect was full range and appropriate to expressed thought content, sensorium was clear, she was oriented, attention and concentration were functionally intact, recent and remote skills were mildly impaired due to medications, and insight and judgment were fair.  (T. 151-52).  Dr. Aldrich diagnosed plaintiff as having pain disorder associated with general medical condition, adjustment disorder with mixed anxiety and depressed mood, mild to moderate, and alcohol abuse.  (T. 153).  Dr. Aldrich found, in part, that plaintiff

> is able to follow and understand simple directions and instructions as well as perform simple tasks independently.  She appears to have adequate attention and concentration for tasks.  [Plaintiff] is able to maintain a regular schedule as her physical condition permits.  She is able to learn new tasks.  Cognitively, [plaintiff] can perform a number of complex tasks independently.  [Plaintiff], for the most part, appears to make appropriate decisions.  However, it is noted she does report to be currently consuming up to a 12-pack of beer per day.  [Plaintiff] can relate adequately with others and, for the most part, appears to deal appropriately with stress.

(T. 152-53).  Dr. Aldrich commented that plaintiff could manage her own funds and that the results of the examination appeared to be consistent with plaintiff's allegations.  (T. 153).

### 7.  M. Apacible, M.D., State Agency Consultant

Dr. M. Apacible, a state agency consultative examiner, completed a Mental Residual Functional Capacity ("RFC") Assessment (T. 169-71), and a Psychiatric Review Technique Form (T. 155-67), on July 7, 2004.  The Psychiatric Review Technique form is a form used to determine whether a plaintiff meets a listed impairment, whereas a Mental RFC form is used to determine the functional limitations that a plaintiff's impairments place on her ability to work.

As a result of completing the Psychiatric Review Technique form, Dr. Apacible found that plaintiff had medically determinable impairments that did not precisely satisfy the criteria, namely adjustment disorder with mixed anxiety and depression, mild to moderate, and alcohol abuse, but that the evidence did not establish the presence of the "C" criteria.  (T. 158, 163, 166).  Dr. Apacible further noted that plaintiff had mild restrictions of activities of daily living and difficulty in maintaining social functioning and moderate difficulty in maintaining concentration, persistence, or pace.  (T. 165).  Dr. Apacible also indicated there was insufficient evidence of repeated episodes of decompensation.  (*Id.*)

In completing the Mental RFC Assessment, Dr. Apacible examined twenty categories of mental function including the major categories of: (A) understanding and memory; (B) sustained concentration and persistence; (C) social interaction; and (D)

adaption.  (T. 169-70).  Of the twenty functions that Dr. Apacible examined, it was

found that plaintiff had moderate limitations in only three categories: 1) the ability to

understand and remember detailed instructions; 2) the ability to carry out detailed

instruction; and 3) the ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent

pace without an unreasonable number and length of rest periods.  (T. 169-70).  In all

of the other categories, Dr. Apacible found that plaintiff was "Not Significantly

Limited."  (*Id.*)

### 8. <u>L. Hill, State Agency Medical Consultant</u>

On July 2, 2004, a Physical RFC Assessment was completed.  (T. 32-37).  This

RFC indicated that plaintiff could occasionally lift twenty pounds, frequently lift ten

pounds, stand and/or walk for two hours during an eight-hour work day, and sit for six

hours during an eight-hour work day.  (T. 33).  The RFC further indicated that

plaintiff was limited in her ability to push or pull in her upper extremities, reach in all

directions, and handle, but that she had no postural, visual, communicative, nor

environmental limitations.  (T. 33-35).

### 9. <u>Guthrie Clinic</u>

On November 1, 2004, Dr. Anthony Nicotera of the Psychiatry Clinic at Guthrie

Clinic evaluated plaintiff.  (T. 281-83).  He stated her hygiene was fair, speech was

coherent, relevant and goal directed, thought content was normal, affect was restricted,

mood was detached, there was no thoughts of suicide, fund of knowledge was normal,

cognition was intact, sensorium was clear, memory was faulty at times, and she was

15

capable of abstract reasoning.  (T. 282).

Dr. Nicotera diagnosed her with major depression, recurrent, alcohol dependency, and personality disorder.  (*Id.*)  He assessed a GAF score of 70, which indicates the existence of some mild symptoms or some difficulty in social, occupational, or school functioning, but generally means that the individual is functioning pretty well and has some meaningful interpersonal relationships.[4]  (T. 283).  He prescribed Lexapro and Seroquel.  (*Id.*)

On November 4, 2004, Clare Brown, of the Psychiatry Clinic at the Guthrie Clinic, found that plaintiff was depressed, had low self-esteem, and self-conscious about her amputated foot.  (T. 279-80).  On November 11, 2004, Brown discussed plaintiff's problems with her husband and earlier trauma.  (T. 278).  Brown stated that plaintiff had poor appetite and sleep, she felt helpless, and concentration had improved slightly.  (*Id.*)  On November 16, 2004, Brown noted that plaintiff felt depressed and starting drinking because her husband left to go to work and left her to tend to the children and complete the housework.  (T. 277).  On November 18, 2004, Brown stated that plaintiff had no suicidal ideations but that she reported feeling depressed and hopeless.  (T. 276).

## DISCUSSION

### 1. <u>Disability Standard</u>

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial

---

[4] *See* DSM-IV-TR 34.

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; ... . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 2.   **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  A court's factual review of the Commissioner's final  decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated*

*Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

### 3.    <u>Treating Physician Rule</u>

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 404.1527(d). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is ***not*** required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that the report is rejected. *Id.* An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

In this case, plaintiff argues that the ALJ failed to adopt and give controlling weight to the opinions of Drs. Yaeger and Anton who stated that she was disabled due

to her physical conditions.  Plaintiff further claims that the ALJ erred by not giving significance to the opinions of Dr. Nicotera and Clare Brown that she was allegedly disabled as a result of her depression.

The record shows that Dr. Yaeger declared plaintiff temporarily "disabled" or unable to work for five or six separate periods of time.  (T. 211-20).  These periods started in late 2003 and ran through 2004 up until January 2005.  (T. 211-20).  Dr. Yaeger found plaintiff "disabled" for these discrete periods of time based mainly on plaintiff's statements to him about her pain.  There was a slight gap between two of the periods where Dr. Yaeger commented that plaintiff "feels she cannot work," and declared her "off work" until December 1, 2003.  (T. 220).  Plaintiff visited Dr. Yaeger visited Dr. Yaeger on December 3, 2003 and he extended her inability to work until February 1, 2004.

It is clear from the record that Dr. Yaeger believed that these were temporary periods of inability to work since he was "trying to get her back to work."  (T. 214). Plaintiff made statements to Dr. Yaeger that she felt "unable to work."  (T. 220).  Dr. Yaeger's office notes also state that another physician (Dr. Koh) believed that plaintiff's medical problems were "psychosomatic."  (T. 213).  The notes from this same office visit state that plaintiff was "unwilling to see a psychiatrist"  (T. 213) despite Dr. Yaeger's recommendation that she do so (T. 211).  Plaintiff's contention that Dr. Yaeger found plaintiff disabled is not supported by Dr. Yaeger's office notes in the record.

 Furthermore, it is clear that the final determination of disability and a

claimant's inability to work rests with the Commissioner.  *Snell v. Apfel*, 177 F.3d 128, 133-34 (2d Cir. 1999); *see* 20 C.F.R. § 404.1527(e).  Thus, such a conclusion would not be entitled to controlling weight.   Moreover, substantial evidence in the record clearly demonstrates that these periods of inability to work were ***not*** a finding of disability by Dr. Yaeger.

Prior to plaintiff's neck surgery, on October 11, 2002, Dr. Anton found that plaintiff's neck was supple, cervical range of motion was full in all directions, range of motion was full in all four extremities, there was no joint swelling or tenderness, the shoulder shrug was strong and symmetrical, sensation was intact, there was normal bulk and tone, strength was 5/5 throughout the upper and lower extremities bilaterally, left triceps reflex was very low but the rest were normal, the left shoulder was sore with movement, and gait was normal.  (T. 114-15).  After the surgery, Dr. Anton noted that she had no more arm pain, weakness, or numbness and that she was very satisfied.  (T. 110).  Subsequently, in December 2002, Dr. Anton found no sensory nor motor deficit in the upper extremities and he stated that x-rays of the cervical spine showed that the lower graft was fused.  (T. 108, 125, 225-26).

In January 2003, x-rays of the cervical spine showed fusion at the C5-6 and C6-7 levels and that bony alignment was satisfactory.  (T. 121, 225).  At that same time, Dr. Anton released plaintiff back to full-time work for February 2003 with no limitations.  (T. 225).  During a physical therapy session in January 2003, plaintiff also stated that she was able to lift her child without pain, lift fifteen pounds overhead without discomfort, type on a computer without pain for a few hours, perform all

activities without pain, and that she felt one hundred percent improvement.  (T. 256).
Thereafter, on October 23, 2003, an MRI of the cervical spine showed that the cervical
vertebral segments were well aligned and there were no definite signal abnormalities
of the underlying spinal cord and on October 27, 2003, another MRI of the cervical
spine revealed only slight forward displacement of the C4 on C5.  (T. 118-19).

On March 11, 2004, Dr. Yaeger reported that plaintiff had been lifting and
pulling to clean her house and that she hired an attorney to maintain her job with the
county.  (T. 214).  He found, in part, that the range of motion of her neck was limited
but that rotation looked normal apart from titling, there was only slight muscle spasm,
strength testing was difficult, reflexes were 2+ and symmetrical, and the left shoulder
had normal range of motion.  (*Id.*)  Dr. Yaeger stated that claimed tenderness was
perplexing because a cortisone shot did not help and x-rays were normal.  (T. 215).
On April 6, 2004, Dr. Yaeger indicated that consultations for her physical ailments did
not show a causative problem and that another doctor opined that the problem could
be psychosomatic.  (T. 213).  In April 2004, Dr. Hanna's consultation showed
essentially normal findings.  (145-47).  Then, on August 4, 2004, Dr. Yaeger stated
that plaintiff's neck was unremarkable although there was decreased range of motion
on extension and left rotation, no paraspinous muscle spasms were present, strength in
the upper extremities was 5+ and symmetrical, and reflexes were 2+ and symmetrical.
(T. 211).  Subsequently, in January 2005, Dr. Yaeger found her neck to be normal.  (T.
202-03).  The same month, Dr. Anton reported that all cranial nerves were normal,
sensory was normal to pinprick and touch, strength was appropriate, and reflexes were

brisk and all present.  (T. 204).  These findings from 2002-2005 demonstrate that conclusions of disability from Drs. Yaeger and Anton were inconsistent with the record.

As for Dr. Nicotera and Clare Brown,[5] none of the records established that either ever opined that plaintiff was disabled because of her depression.  (T. 277-83).  In fact, Dr. Nicotera stated that plaintiff's speech was coherent, relevant and goal directed, her thought content was normal, her affect was restricted, and her mood was detached.  He found no thoughts of suicide, found her fund of knowledge was normal, her cognition was intact, sensorium was clear, and although her memory was faulty at times, she was capable of abstract reasoning.  (T. 282).  He assessed a GAF score of 70, which indicates the existence of some mild symptoms or some difficulty in social, occupational, or school functioning, but generally means that the individual is functioning reasonably well and has some meaningful interpersonal relationships.  (T. 283).[6]  These findings were supported by substantial evidence, discussed by the ALJ, and contributed to the RFC determination.  (T. 24).

## 4.   **Credibility**

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of

---

[5] Based on the records, it does not seem as though Clare Brown was a physician or a psychiatrist.  (T. 277-80).  As such, Brown would not be considered as an acceptable medical source under the Social Security Regulations and any opinions rendered would not be entitled to controlling weight.  *See* 20 C.F.R. § 404.1513(a).

[6] Although LMSW Irwin assessed a GAF score of 52, he is not considered to be an acceptable medical source under the Regulations, and as such, his opinion would not be entitled to controlling weight.  (T. 183); 20 C.F.R. § 404.1513(a).

credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...."  20 C.F.R. § 404.1529(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any

measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  *Id.* § 404.1529(c)(3).

Plaintiff argues that the ALJ's finding about her credibility is erroneous because the ALJ failed to properly address her daily activities and work history.  This court has examined the record, and finds substantial evidence to support the ALJ's credibility finding as discussed in his decision.  (T. 22-24).

Plaintiff states that the ALJ found that she did the dishes and laundry, cared for two children, and prepared meals without noting that she received help in these areas.  However, the ALJ stated that plaintiff "takes breaks when performing household chores, and requires some assistance from her oldest daughter and her husband."  (T. 22).[7]  This clearly demonstrates that the ALJ factored in plaintiff's testimony that she occasionally needed help with tasks.

Plaintiff also claims that the ALJ erroneously found that plaintiff could visit friends, had no difficulty in getting along with others, and had only mild difficulty in maintaining concentration, persistence, or pace.[8]  Nevertheless, plaintiff testified that she would visit her friends occasionally when her husband was at home.  (T. 299).

---

[7] Notwithstanding, after a physical therapy session on January 16, 2003, plaintiff reported being able to lift her child without pain, lift fifteen pounds overhead without discomfort, type on a computer without pain for a few hours, perform all activities without pain, and that she felt one hundred percent improvement.  (T. 256).

[8] It should be noted that these statements made by the ALJ, along with those relating to caring for her two younger children and preparing meals, were in regards to finding that plaintiff did not meet the Listings for her mental impairment, a determination which plaintiff does not challenge.

Additionally, the medical evidence demonstrates that plaintiff had no difficulty in getting along with others and that she had only mild difficulties in maintaining concentration, persistence, or pace. Dr. Aldrich opined that plaintiff could relate adequately to others, her attention and concentration were functionally intact, and she had adequate attention and concentration for tasks. (T. 151, 153). Dr. Nicotera stated that her cognition was intact, she was capable of abstract reasoning, and she had only some mild symptoms or some difficulty in social, occupational, or school functioning, but she was generally functioning reasonably well and had some meaningful interpersonal relationships. (T. 282-83). Although Dr. Apacible found that she had moderate difficulty in concentration, persistence, or pace, Dr. Apacible also stated that plaintiff was not significantly limited in six out of the eight categories of sustained concentration and persistence. (T. 165, 169-70). Dr. Apacible further opined that plaintiff was not significantly limited in any of the categories relating to social interaction. (T. 170).

Plaintiff further claims that the ALJ failed to properly address her work history as she had worked for a significant period in her life. Plaintiff's argument is perplexing. The ALJ noted that plaintiff had prior work experience as a sewing machine tender, typist, and waitress. (T. 21). The ALJ also stated that plaintiff was able to work as a waitress despite her partially amputated right foot and she had a "fairly stable work history" in spite of having alcohol and cannabis use problems. (T. 21). Moreover, the ALJ took into account plaintiff's testimony regarding her limitations in her ability to work as he stated in the RFC determination that plaintiff

26

could lift only five pounds with her left hand, she could alternate positions every ten minutes during the two hours when she was standing, and she could perform only those jobs requiring no overhead reaching.[9]  (T. 24).  The ALJ was not required to give full credibility to plaintiff's testimony that she was not capable of working.  *See Rosado v. Shalala*, 868 F. Supp. 471, 473 (E.D.N.Y. 1994) (citing *Misuraca v. Sec'y of Health and Human Servs.*, 562 F. Supp. 243, 245 (E.D.N.Y. 1983) for the proposition that "[the Commissioner] was not obligated to accept plaintiff's subjective testimony without question").

Based on the record and plaintiff's testimony, the ALJ's findings regarding plaintiff's daily activities and work history were not erroneous.  The ALJ's determination is supported by substantial evidence and substantiates his finding that plaintiff is not as limited as she states.

## 5.    <u>Vocational Expert</u>

If a plaintiff's non-exertional impairments "significantly limit the range of work" permitted by the plaintiff's exertional limitations, then the ALJ may not use the Medical-Vocational Guidelines exclusively to determine whether plaintiff is disabled. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986).  If the plaintiff's range of work is significantly limited by her non-exertional impairments, then the ALJ must present the testimony of a vocational expert or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform.  *Id.*  A vocational expert may provide testimony regarding the existence of jobs in the national economy

---

[9] Plaintiff does not challenge the RFC determination.

and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations.  *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence,[10] a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for the VE's testimony.  *See De Leon v. Secretary of Health and Human Services*., 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  The Second Circuit has stated that there must be "substantial record evidence to support the assumption upon which the vocational expert based his or her opinion." *Dumas*, 712 F.2d at 1554.

Plaintiff argues that the hypothetical given to the VE failed to present the full extent of her physical and mental impairments, namely her inability to stand and walk for long periods and the effects of her depression.  However, the ALJ did in fact present a hypothetical question that incorporated elements of the opinions of treating and consultative physicians and psychiatrists.  The first hypothetical presented by the ALJ took into account plaintiff's age, education, past relevant work, as well as RFC, which stated that plaintiff could lift and/or carry ten pounds frequently and twenty pounds occasionally with her right dominant hand and five pounds with her left hand, sit for six hours in an eight-hour workday, stand for no more than two hours while alternating positions every ten minutes, and never reach overhead.  (T. 24).

---

[10] *Dumas*, 712 F.2d at 1554 n.4.

Additionally, plaintiff could remember, understand, and carry out no more than simple instructions and carry out simple work-related decisions.  (*Id.*)  In response to this hypothetical, the VE testified that plaintiff would be able to perform two separate jobs, preparer for jewelry processing and lens inserter, and that there were a sufficient number of these jobs available.  (T. 309-10).

The first hypothetical presented to the VE was proper and incorporated all of plaintiff's impairments.  Due to her partially amputated right foot, the ALJ specifically stated that during the two hour period plaintiff would stand, she could alternate positions every two hours.  Substantial evidence supports this determination as there is no evidence in the record of complaints of pain emanating from her right foot.  Furthermore, Dr. Anton noted that she had 5/5 strength in the lower extremity bilaterally and that gait was normal.  (T. 115).  Dr. Hanna stated she could walk on her heels and toes without difficulty, station was normal, and squat was full.  (T. 145).  Dr. Thompson additionally stated that there was no swelling or tenderness in the right foot.  (T. 179).  Moreover, this portion of the RFC determination not only conforms to the physical RFC assessment rendered by the state agency medical consultant, but the ALJ provided further restrictions beyond those stated by the consultant.  Thus, the ALJ clearly factored plaintiff's amputation into his RFC assessment.

In regards to her mental impairments, the ALJ considered plaintiff's depression and opined that she could remember, understand, and carry out no more than simple instructions and carry out simple work-related decisions.  This determination is also supported by substantial evidence.  As stated previously, Dr. Aldrich opined that

plaintiff

> is able to follow and understand simple directions and instructions as well
> as perform simple tasks independently.  She appears to have adequate
> attention and concentration for tasks.  [Plaintiff] is able to maintain a
> regular schedule as her physical condition permits.  She is able to learn
> new tasks.  Cognitively, [plaintiff] can perform a number of complex
> tasks independently.  [Plaintiff], for the most part, appears to make
> appropriate decisions.  However, it is noted she does report to be
> currently consuming up to a 12-pack of beer per day.  [Plaintiff] can
> relate adequately with others and, for the most part, appears to deal
> appropriately with stress.

(T. 152-53).  Dr. Apacible also found that plaintiff was not significantly limited in her

ability to understand, remember, or carry out short and simple instructions and make

simple work-related decisions.  (T. 169).  Dr. Nicotera further reported that plaintiff

had only mild symptoms and that she was generally functioning pretty well.  (T. 283).

Although substantial evidence supports the first hypothetical question, plaintiff

claims that the second hypothetical, which stated that plaintiff would need

unscheduled breaks during the workday, was instead correct.  The vocational expert

responded to this hypothetical by stating that there would be no jobs available.  (T.

309).  Despite plaintiff's argument, no physician opined that plaintiff would need

multiple unscheduled breaks during the day to rest.  Moreover, Dr. Aldrich opined that

plaintiff was able to maintain a regular schedule as permitted by her physical

condition and Dr. Apacible found that plaintiff was not significantly limited in her

ability to perform activities within a schedule, maintain regular attendance, and be

punctual without being distracted by them.  (T. 153, 169-70).

Based on substantial evidence in the record, the ALJ properly presented and

relied upon the first hypothetical question posed.  Thus, the ALJ did not err by failing to adopt the VE's opinion from the second hypothetical.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED** and the Complaint (Dkt. No. 1) be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: May 2, 2008

Hon. Gustave J. DiBianco
U.S. Magistrate Judge